Good morning, your honors. May it please the court, Roseanne Frazee, representing plaintiff appellate, I along with, I'm sorry, I got a little bit of cold here, I along with other attorneys represent the plaintiff in the trial court. May I please reserve at least three minutes for rebuttal? We'll help you watch the clock. Thank you. Reaching back to Graham, I want to call your attention to Graham v. Connor? Correct. I want to call your attention as to whether the degree of force, a kill shot, was warranted by a government interest at stake in this personal automobile accident case where there was absolutely no damage to the deputy's car, Mr. Barraza's car. This is an interesting case because we frequently get these cases on summary judgment, but here we have two jury trials. That's correct, your honors. So a jury heard all this information. Correct. And found against your client. Correct. But there were so many errors, I want to go through them. Good. Which I did. Good. Thank you. My client sees a new trial in this near fatal road rage case to prevent a grave miscarriage of justice. Quoting Montgomery Ward v. Duncan, which is what the judge quoted in his order denying the motion for new trial. A new trial may be warranted if the trial was not fair to my client and substantial errors in admission. We understand that. What errors would you misleading jury instruction. The court gave a criminal jury instruction on brandishing a weapon. 417 of the penal code. Correct. A crime for which my client was never charged. But he doesn't have to be charged. Well, he was never charged. If he's brandishing a knife in a dangerous way, that could be part of the circumstance. Is that right? Your honor, he was not brandishing a knife in a certain way. That's only the deputy's testimony. But see, that's the point. We're past summary judgment. We're at a trial. And the instructions are formulated and we take a look at them, not de novo, but for an abuse of discretion. What instructions are you attacking that you say resulted in your client getting an unfair trial? Well, basically that because we ended up having a criminal trial. And you have to understand your honor, the eyewitnesses, this is only the deputy self-serving testimony about brandishing a weapon. But we've had a jury listen to all of that. This is not summary judgment. I know that. There was so many errors. Can I go through them? Yes. Okay. One of them was the jury instruction, which you can always see. Also, the fact that he, the trial judge did not give my requested jury instruction on provoking or confronting. This isn't a first amendment case. And that evidence was presented to the jury. But your honor, he didn't give the special instruction with regards provoking the incident. And then also your honor, just to quote you, what case says that they had to give this instruction? Well, it's, you know, the ninth circuit has, has established it, um, for, for a long time and villains, um, says what? That's helps you. Pardon? That's what, what does it say that helps you? That the instruct, that the brandishing instruction has to be given in a case or shouldn't be given in a case where somebody may have brandished a weapon. This is a first amendment case in a certain regard because, because Drew, first of all, he didn't brandish the weapon. The eyewitnesses never saw that. This is a self-serving one statement by a deputy who, who, and then in denial, but it was evidence. Pardon? It was part of the evidence. It was only the deputy's testimony and, and the expert who, who's, who sat there and said, I know all the facts in this case. When in fact, he didn't know the facts in this case. He never sat through the trial. He, he, he misrepresented the facts of the case. Did the deputy testify that, that, uh, the, uh, that your client brandished a weapon? He said my client never threatened him with a weapon. What did he say he did with a weapon? He took, well, this is the whole problem. He changed his story five times, at least five times. First, he said, you're arguing a case to a jury, right? We're in a pellet court. I know, but, but you know, I'm, I'm looking at, you know, the whole thing is, but the question, the question is a simple one. Okay. Did, did, um, did Mr. Baranza state that he saw the, that he saw the knife, the knife folded? Okay. Did he say that he saw the knife? Yes. My, my, my client showed him the knife and put it on the passenger seat. There's no question that the client showed him the knife. Correct. When he asked him if he had any weapons, he pulled it out of his Dickie short, showed it to him and put it on the passenger seat. And that's it. The deputy said that he was belligerent swearing. That's the deputy. I'm really sorry. I'm not criticizing you, but you don't understand that there has been a trial and what the, what the, what the witnesses said, don't help you in that respect. But the eyewitnesses never said that or saw that the expert got on the stand and, and verified the facts that the, that the deputy said, that's what the expert did. He goes, I know what the case is and let me tell you what this is. And therefore there, and you can look at the judge's order, deny our motion for summary judgment. And the judge only says the substantial evidence was with some browser and the hired expert by the County. That's all it was. The eyewitnesses discounted what the deputy said. Counsel, the argument that you're making, I think is one that you made that you fairly made in your brief, which is that the verdict is against the weight of the evidence, but that's asking us to overturn the jury verdict. I know. And that's tough. It's tough. But, but it seems to me that, that everything that you've said so far is, is that you're making that argument, not, not that you really want to play around with the jury instructions or the expert witness. What you really are telling us is that you believe that the jury, that the, that the verdict was against the weight of the evidence. You might want to focus on that. If that's really your argument, if it's not, you can go on, but you can go on with your argument. Because, because look at in denying the motion for summary judgment judgment, the judge focused on the self-serving evidence with, with, with the deputy and the experts, experts, um, testimony. He did not take into the fact that we had two Whittier police officers testify. Are you attacking the judge's ruling that you're allowed to go to trial? I'm sorry. You're now you're talking about the summary judgment motion. No, I'm talking about the motion for a new trial. You said summary judgment. I'm so sorry. I didn't mean to. I'm talking about the motion for a new trial that the judge denied. The judge clearly only took in the count of the Barraza's testimony. That's what he's supposed to do. You take a look. Okay. But then he didn't take into account the eyewitnesses. Counsel, he does. If he had done so, it would have been reversible error for him to have granted a new trial on that basis. He is supposed to take the evidence in the light, most favorable to the jury verdict. Well, but the whole thing is it was all unfair and it was, it was all a bunch of lies. It may have been lies counsel, but that's why you let it go to the jury and you let the jury figure it out. You tell the jury that it's lies and you let the jury determine how can we overturn this? Why we haven't seen any of these witnesses. I know, but you know, I've given you the transcripts where you can see the witnesses. I can, but I don't, I can't see their demeanor. No, but that's, that's what the jury can. The jury can see their demeanor. The jury is going to hear your argument that Mr. Barraza is lying. Okay. Look, you know, the expert went beyond the rule 26 report, correct? That's one of my arguments. Do you know that? And therefore this expert testified just before we went to the jury, the expert got up on the stand, verified what Barraza said, not taking into account the eyewitnesses of nothing and, and went beyond the rule 26 report. Um, and you know, that is a clear error under rule 37 and, and some of the other cases that I've given to you. You want a new trial also based on the CT scan? Yes, because what, you know, the photographs, but photographs that we were not able to show the jury. Well, was that excluded as, as evidence? Yes. The stacked CD images were taken nine days before the trial. Is that right? No, it wasn't the stacked CD scans. It was just the, it was just the photographs. Um, but I thought your new trial said you were, you went on a new trial because you had newly discovered evidence. Well, after, after the last trial, when, when was the last testimony of the, of the, of the deputy? Cause he changed his testimony so many times. Like then my client who's expert with regards to these sort of things, got some software, overlaid the x-rays onto his body to show that the deputy was totally lying and it couldn't happen the way he said. And it's self-serving statement. I mean, that's, that should have been done before the trial. That technology was available. The stacked CD images were taken before the trial. That should have been done. Excuse me, if you'd wait until I asked my question, then I'll understand your answer. Wasn't all that, that should have been done before the trial. Well, shouldn't it? It was the, the technology was available and the stacked CD images were there. Why wasn't it done before trial? You know what, your honor, we couldn't, the judge wouldn't let us put the photographs in. So if we had no photographs, how could we put the x-rays on, on the CT scan? And also, as I just said, we didn't really think it was necessary because the guy was sitting in his car. So you, you didn't think it was necessary. So you made a choice not to pursue that. Well, we didn't realize it until we saw all the lies he starts telling again, different lies at the last trial. The last trial, he got up there and changed his testimony again. And was that presented to the jury? Yeah, but the jury didn't know he changed his testimony. This wasn't presented to the jury whatsoever. And neither was the photographs of him sitting in the car. So that I understand, Mr. Sandoval sent him, please stand up. He's a, he's a six foot five guy. He turned around to get out of the car. This little deputy is standing there. He gets, he, he starts turning the deputy, the deputy panicked out. The deputy wanted him out of the car. And then when he went to get out of the car, he shot. Did they take a blood alcohol test on your client after this? They took it hours later. What was it? What did it show? You know, it's, it, it was really high, but what does really high mean? It was over the limit. Which is what? Well, you know, the whole thing is they took it in an emergency room, like two hours later. And it was still over the limit? Yeah. Because when, when you take it from the emergency room, you don't take it from the vein, you take it from an artery and it's 40% higher. I had a taxology expert ready to testify to that. And also, even, even though he had forebears during the day, my psychiatrist and the opposing psychiatrist said that he probably had a tolerance. What, you know, so he was totally functional. He felt he was functional. This is a trained firefighter. He wouldn't have got in the car unless he was functional. Well, counsel, that's, you know, we have, we have, we have lots of smart people in this country who get into cars every day and drive while they're drunk. The problem with being drunk is that it's, it's a, it's a self-disguising disease. And is it a reason to be shot? Counsel, that's why you got to go to a jury. You had all this, you had this opportunity to, to, to make this in front of a jury. And you add, he wouldn't let, he wouldn't let me bring in the, the, um, the expert with regards to how, how it actually happened, nor did he let me bring in the expert with regards to the taxology report to show that he was not over the limit. I'm sorry, I'm not, I'm not watching my time. Uh, you've got about two minutes. Uh, we've taken quite a bit of your time. I'm going to give you some time for rebuttal, so you may want to preserve the rest of your time. Thank you, Your Honor. I'll be happy to answer any more questions. Okay. Mr. Moore. Good morning. I think it's still morning. Thank you. I'm Dave Moore on behalf of the Mike Barraza. Uh, this judgment should be affirmed. Uh, the, uh, verdict and the succeeding judgment, it's all supported by substantial evidence. You had two primary witnesses to this incident. There were other third party witnesses. They saw bits and pieces. He had two primary witnesses. One of those witnesses is a trained law enforcement officer. And he's about what, 22? He's fairly young. I think he was, I want to say 24. I don't know how long he'd been a law enforcement officer. Uh, I think between one and two years, but again, I'm, I'm not sure. And he wasn't, he wasn't a sheriff's deputy. He was, he was a correctional officer, right? Well, he was a sheriff's deputy. He'd been working in, in the county. He was working in corrections. He's not a street officer. That's correct. And you're not going to say his, his conduct was exemplary, I don't think. His conduct comported with accepted standards as testified to by the police practices expert, Clarence Chapman. Now, could he have done things differently? Yeah, probably, but that's not. You don't even have to answer that question on this record, do you? I, I probably don't. I don't think so. Uh, nonetheless, there's no evidence in the record that he was impaired in any way. On the contrary, the other witness to this event had a blood alcohol level of nearly 0.30, nearly, not quite, as measured approximately in an hour after the incident. So we don't know what his blood alcohol level was during the incident. So it's not surprising that the jury accepted the version of events that was testified to by deputy Mike Barraza. Did, did, uh, did your client, um, change his testimony in any material regard? I know that he... Let me start with something. Let me start with the first question. Did he change his testimony in any regard? My understanding is that he did change, uh... What things did he change? The primary thing that he changed was, I think he initially indicated to the investigating officer, if you want to call that testimony, and I'll, I'll agree, uh, that the knife was being held by Mr. Sandoval in his right hand. He subsequently testified that it was held in his left hand. To the left hand. Correct. Uh, did he ever see the blade at any time? No. My understanding is, is, and he testified to that effect, that the blade was never deployed. You know, the, the, the space that they were in was awfully small. Very, very small space that a drive in. And the, with the, with the door of the Volvo open, you haven't got much of a target there. I mean, this isn't, uh, uh, he didn't fire through the windshield. He fired, he fired from in front of the car through a door that was just barely cracked. I, I don't disagree with anything you've said there, Your Honor. It was a somewhat confined space. There was room to move, obviously, because he was able to get out of his car. And, and he was, and he was concerned that, that he might be it could have been in his waistband. It could have been to the right on the, on the front seat next to Mr. Sandoval, because which Deputy Brock, which he was, if he was right-handed, if he pulled it off of the right, then he still would have had to have pulled it across his body to fire through an open one. Either he'd have to fire it through his windshield, or he'd have to fire it through this, this crack at this officer across his body. That's a very, very awkward, not exactly a fluid motion that could have been made. Not much of a fluid threat. I would submit, Your Honor, that history is filled with incidents of shootings that have involved far more gymnastics, if you will, than that. It's not a stretch to reach over to your right and pull back. It can happen in a split second. Exactly what are the facts that caused your client to believe that he was menaced with a firearm? Specifically with respect to a firearm, I would cite... The client was afraid of a firearm? He, he was. He testified that he didn't know if perhaps a firearm or some other type of weapon was in the car. Just total speculation, or was there any, any even scintilla of a fact that suggested a firearm? Aside from all of the occurrences that had happened up to the point where Deputy Barraza approached the car, I would cite to the fact of the brandishing of the knife that tells Deputy Barraza, this man has a weapon. If he's messing with a knife, where do you get the firearm out of this? It's the possibility of a firearm. We know that he has a weapon. The possibility is pretty diaphanous. I mean, there's a possibility you have a firearm right now, or one of the lawyers who was in here earlier who got upset with some of the questioning had a firearm. I mean, there's a possibility. That's true. I mean, I had a case years ago where a woman was in a courtroom. She didn't like the hearing. She didn't like what the judge had to say. She walked outside and put six bullets in his name on the outside of the room. I mean, she had a firearm. Nobody knew that. Possibilities. That gets pretty tough, doesn't it? If I think you have, if there's a possibility, there's a possibility he has a firearm. I don't know. I mean, can I start, see, he reached in his coat. Can I start shooting him on a possibility? All the occurrences that have happened? For example, what? Okay. The first thing that happened was the two bumps of the car. That doesn't suggest the firearm. Taken in and of itself, absolutely not. It's the totality of the circumstances. But even, okay, keep going. What else? Sure. The first bump, no big deal. That happens sometimes in drive-thru lines. You then have a, within a short period of time, a second harder bump. That means a firearm. Well, no. No. Keep going. What's, where do we get to the firearm? Then you have the cursing and the belligerence. So the deputy gets out of the car. This is before Deputy Barraza even got out of the car because he called out, hey, you're hitting my car. And eventually he gets a response of, F you, pardon my French, F you, go call the effing cops. Okay. We've got two taps, two bumps, two hits to his car. We've got belligerence and cursing. Now he needs to get out to see, hey, what's going on here? We still don't know that it's a life-threatening situation. You know what you're ignoring too? He didn't just get out of his car and walk to see what was happening. He happened to have his gun in his hand when he got out of his car, didn't he? The testimony is that he didn't get his gun out until he saw the knife. I know that there's some testimony that's different. Deputy Barraza. It shows that he had his gun out when he got out of the car. He said he wasn't drawing it, but he had his gun in his hand because he was afraid to leave it in the car. His car was unlocked, and so he had it in his hand. Is there any question about that on this record? The testimony was he didn't want to leave the gun in the car, an unsecured gun. Right. But there's also testimony from Deputy Barraza that he didn't produce his firearm until he saw the knife. Where was the gun in the car that he didn't want to leave in the car? Was it on his person? Initially, and I apologize, I should know that. I don't think so. It's in the record. I think it was not in his holster. He subsequently... Right. So he grabs his gun, gets out of the car. Hello? My understanding, Your Honor, and I would respectfully request that if there's any issue on this, I could submit a supplemental letter with the appropriate citations to the record. My understanding is that he put the gun in his waistband because he did not want to leave an So he gets out of the car with his gun. He gets out of the car. It's on him. He's not pointing it at Mr. Sandoval or anything. He goes back toward the rear of his car and the front of Mr. Sandoval's car. And after some cursing, belligerence, et cetera, he... An allegation that they're spitting and throwing money. Throwing coins, yeah. Correct. At what point does that occur? It's after Deputy Barraza goes to the rear of his car slash front of Mr. Sandoval's car. And he was not uniformed, so he's got a badge with him, and he puts the badge on the trunk of the car or on the hood of Mr. Sandoval's car? My understanding is testimony that he displayed the badge, and then he put the badge on the front of Mr. Sandoval's car so that it could... At this point, he's seen the knife. So he now has his handgun out. When does he take the phone out and hand it through the window? I think there was testimony that he did that immediately after exiting his car. I think we said in our brief that he handed it to the employee through the window. That may be incorrect. I don't think it's a material change. There's no dispute that he handed his phone to the employee and said, hey, can you call 911? And it's not because he thought it was a life-threatening situation at that point. It's because he thought there'd been a traffic collision, and he wanted to have a uniformed officer come out to deal with the situation. How much damage was there to his car? Oh, none. I don't think it was even visible. Of course, he didn't know that when he exited his car. And that requires police to take police reports in Los Angeles? They're not going to roll to something like that. I think it was Whittier, something... I'm talking about the county. They're not going to roll to something like two cars. Well, at the point he hands his phone to the employee, you don't just have the double taps at that point. You've also got the F you, call the effing police being said to him. So he's like, okay, I guess I better call the police. This doesn't have anything to do with anything, but I learned on about my second day as a driver in 1966, don't mess with anybody. I had a case where two guys bumped into each other just like that in a parking lot. They're both backing out. They back into each other. Driver number one gets out and says, you stupid son of a bitch, watch where you're going. Driver number two reaches into his car, grabs a machete and starts chopping up driver number one. I learned just say, thank you very much. Have a nice day. I'm with you, your honor. This is a classic example. I think there are a lot of people who wish that things had gone differently in this case, but I don't think that it was deputy Barraza that escalated the situation. It was Mr. Sandoval who brandished his knife. Yes, he brandished the knife. There was testimony from deputy Barraza to that effect. It doesn't matter whether opposing counsel thinks it's self-serving. The jury had the opportunity to assess credibility and they did. So the deputy grabbed his gun and Sandoval grabbed his knife. Didn't he ask him if he was armed? Didn't Barraza ask him if he had anything on him? I think so, your honor. And at that point, he complies with Barraza's request and pulls the knife. It's not exactly brandishing it if you don't have the blade pulled and you're complying with a request from somebody who's told you that he's an officer. Respectfully, I disagree. He did more than just show the knife. According to deputy Barraza, he kept waving it back and forth. But not the blade. The blade was not deployed. But I want to respectfully suggest to the court, that blade could have been, easily could have been deployed in a split second. And Mr. Chapman testified to that effect because he has experience with those types of knives. It wasn't the knife he was afraid of. On this record, he says he was afraid of being shot with a gun. So the knife doesn't get into the... There were two critical events. The brandishing of the knife caused deputy Barraza to start thinking, this is now a potentially dangerous situation. You know what twists your problem though? Is that he had his gun, you say in his waistband, but the record suggests, at least to me, that he had his gun in his hand when he exited the car. Now let's assume he had it in his waistband in any event. If he saw the knife and that's all he saw, then why was he put in danger? Why did he think he was being put in, his life was being put in danger? At that point, once you see a dangerous weapon, and he still at that point was giving instructions, hey, put the knife down. He still didn't shoot at that point. It was the brandishing escalated the situation. And then it was repeated refusals to comply with, keep your hands in view. He kept pulling his hands down, putting them back up, pulling them down. Doesn't the record show though that his instructions were not consistent? Get out of the car, stay in the car, get out of the car, don't move. Something of that sort? I don't believe so, your honor. I think the record's pretty consistent that he issued repeated warnings and instructions to Mr. Sandoval, keep your hands in view. And he repeatedly refused to follow. Why was Barraza kicking his door? Deputy Barraza testified that that was an attempt on his part to effect command presence, which was something he'd been trained to do. Kick a car door? Get the suspect's attention and make him know. Like hitting the mule with a stick? I mean, kicking the car door? I don't think they teach that at post. I never heard of that. All I can do is tell you what's in the record. And it was unrebutted as far as I know. You're lucky this case is here on a jury trial, not summary judgment. Well, I wouldn't disagree with you, your honor. But it did go to a jury. And the jury assessed credibility. And the jury found that Deputy Barraza's version of events was the true version. No, they just found that the case hadn't been proved. Well, that's true. I amend my statement. I agree with you. But if Mr. Sandoval had satisfied his burden of proof, we'd have a different verdict. He didn't do that. The jury instructions were completely appropriate. Certainly, there's been no showing of an abuse of discretion. What about the photographs? All of that business? Yeah. This case had been going on for years at that point. Photographs of the scene. Any reasonable attorney would have known that photographs would be necessary. The photographs that they took, they took and provided them to defense counsel just days before the second trial. And those photographs should have been taken months or even years. Why were they excluded? My understanding is they were excluded in part. You know, you keep saying my understanding. That makes me nervous. I don't really care. Not a criticism of what your understanding is. I don't know what happened. When I say that, I'm going by my memory of the record. Okay. First of all, they were not provided to defense counsel except until days before. Is that why they were not allowed to be admitted? That was one of the reasons. What was the other reason? The other reason was that they lacked foundation. There was no way of showing whether they depicted the events in question. Accurately at the time of the event? Exactly. How many years later was that? The event occurred in 2009, and then we're talking about 2012. So nearly three years. The photographs that were excluded are the ones where they used the models? Is that right? They brought the car back, put it in the drive-through. I believe so. That's my way of saying that's my understanding. Okay. If you have any other questions for me, I see my... I don't think so. Thank you, Mr. Moore. Thank you. All right, Ms. Racy, you've got time remaining. With all due respect to counsel, he doesn't know the facts of this case. I like that. With all due respect. Sounds like a bully. The guy's an idiot. Okay, look at record 199. He draws the gun before he walks back there. There's a photograph. It was on the video that we cut out. No, the jury did not see this. Because after the trial, when my client got his mind back a little bit, you have to understand, he was dead on arrival at the hospital, was in the hospital forever, had heart attacks and everything, and he didn't have his mind. He took the video and took the grains out of it and came up with this photograph. And no, the jury didn't get to see it. But you can see the gun was drawn right before he went back there. Why didn't the jury get to see it? As I just told you, because we didn't have it. Because this. So you didn't prepare this in time for the trial? Correct. Three years later? Correct. Okay. Okay. That's why it was excluded and wasn't turned over? You know what? The judge never saw this. This was submitted with regard to the motion for a new trial. Okay. So you didn't prepare it three years later and you didn't prepare it in time for a second trial? Correct. Okay. I gave this to the judge with regards to the motion for a new trial to show that the gun was pulled away from the window, all with regards to provoking the event. You know, Sheehan case is very much on point on this particular case because he provoked the incident. And as you saw, even the county found out that he did. Don't you know what you have to... The problem that you face, I think, is that you've had two trials. I know that's my problem. And that's why I started the Guilford case. I spent hours trying to find one with the second trial. And this was a jury instruction was on... And then how do you define the narrow question that is before us as we review the records? How do you... Tell me what you see as the issue that is before us for resolution. The pivotal issue, the issue on which this case is going to turn. What do you think it is? The whole unfair trial of it. The whole trial was permeated with regards to the criminal conduct. And also, excuse me, missed... No, but you see, you have to have an offer to exhibit and have the court refuse to accept it. Well, he refused the photograph. If you're going to base that as the error, if it wasn't presented, the court certainly couldn't admit it. I know, but the judge could have given some... He took a year with regards to ruling on the motion for a new trial. And this was failable to him to even prove. You have to understand that George was tired of this case by the second trial. He worked on the bench. He didn't pay attention. But the whole thing is, this was provided to the judge and he should have considered it in connection with the motion for a new trial. That's the fact that the browser was lying the whole time. What did he say about those in denying the motion for a new trial? He just didn't consider it newly discovered evidence, that's all. Because I contended it was... And it wasn't newly discovered evidence because it could have been done before the trial. Your Honor, I wish someone could have done it. We had experts after experts. The county has experts and nobody went in and cleaned up that video. That does not make it newly discovered evidence. That's the point. Well, it should be evidence that should be considered by the jury in a new trial. Why didn't you go in and clean up that video before the second trial? We cleaned it up to a certain extent and the county used our video because we cleaned it up. Why didn't you clean it up to the extent that it was done here? You know, this is new technology that my client... It was available before this trial? No, this is a 3D and he put it in, he found one with regards to the movie industry. When they came out, started coming out with 3Ds, he found a program he could come in that would have these little features that could be shown. The point is it was a pre-existing program. Pardon? It existed. No, not the program he ended up using to show the finite details. When was the program created? I don't know what program he used. I can ask him. Well... But he used a program so that... You know, if you weren't ready for trial, you weren't ready for trial. That should have been done beforehand. I'm not criticizing you. We are an appellate court. You demanded and asked for a jury trial and you got two of them. And now you say, well, we got some stuff that we came up with after the trial. We get another one. You know what, Your Honor? That rarely works. You know what, Your Honor? The record will show I went in because Brian Dunn was on the case, and he dropped out of the case for personal reasons. And you can see that this was dumped on me. And I went in and tried to get a continuance. It's a part of the record so that we could rework some of this evidence. And this could have been one of them. You know, the experts, the photograph... Well, you haven't appealed the denial of the continuance motion. Pardon? You haven't appealed the denial of a continuance motion. You know what? I looked through the federal rules and there isn't. The judge told me to find something in the federal rules, and it's totally up to the discretion of the judge. You didn't appeal it, though. No, I didn't appeal it because we had a trial... What are we supposed to do with that? You didn't ask us to even look at that until just right now. Yeah, I did ask you to look at it now because this is the whole ambience of the unfair trial. This is part of the unfair trial. Ms. Frasey, we've taken you well over your time. I think that we understand your position. Thank you. I just want to mention one more thing, and that's the fact that all of this circumstantial stuff that they've come out with, the witnesses did not see the branch of the weapon. The witnesses did not see... And you have to understand, if we went to the jury site... Ms. Frasey, your time has expired. Okay. Well, if we went to the site, you want to know... I think your time has expired. Thank you. I could go on for hours. I'm confident of that. Thank you. The case is submitted and the court is adjourned.
judges: Farris, Trott, Bybee